IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

MINNESOTA LAWYERS MUTUAL,      )
INSURANCE CO.,                 )
                               )
     Plaintiff/                )
     Counter-Defendant,        )
                               )
          v.                   )     1:15-cv-1485 (JCC/JFA)
                               )
PROTOSTORM, LLC, ET AL.,       )
                               )
     Defendants/               )
     Counterclaimants.         )

**MEMORANDUM OPINION**

This matter is before the Court on cross-motions for summary judgment for a declaration regarding Minnesota Lawyers Mutual Insurance Company's ("MLM") obligation to indemnify a Virginia law firm for a malpractice judgment. The insurance policy (the "Policy") at issue provides $10 million in coverage for any claim arising out of any act, error, or omission that occurred after October 25, 2006. But the Policy provides only $5 million in coverage for any claim arising out of any act, error, or omission that occurred on or before that date. The controversy in this case is whether MLM is obligated to indemnify $10 million or $5 million. For the foregoing reasons, the Court concludes that the $5 million liability limit applies and the Court will grant summary judgment for MLM.

1

## I.   Background

Because this case involves an insurer's duty to indemnify, the Court constrains its review to the proceedings in the underlying malpractice lawsuit, the facts litigated therein, and the insurance policy at issue.  *See CACI Int'l, Inc. v. St. Paul Fire & Marine Ins. Co.*, 566 F.3d 150, 155 (4th Cir. 2009); *Capital Envtl. Servs., Inc. v. N. River Ins. Co.*, 536 F. Supp. 2d. 633, 645 (E.D. Va. 2008).

In 2000, Protostorm, LLC ("Protostorm") retained the Virginia law firm of Antonelli, Terry, Stout & Kraus, LLP ("the Firm") to prepare and prosecute patent applications for Protostorm's advertising-based internet game.  (SOF ¶ 7.)[1]  To that end, the Firm filed a provisional patent application with the U.S. Patent and Trademark Office ("PTO") in June 2000.  (SOF ¶ 8.)  The final application was due one year later, on June 27, 2001.  (SOF ¶ 8.)  Instead of filing a final application in only the United States, the Firm timely submitted a Patent Cooperation Treaty filling ("PCT Application") on June 25, 2001. (SOF ¶ 9.)  A PCT Application allows a filer seeking international patent protection to simultaneously establish a

---

[1]    Citations to "SOF" refer to the undisputed facts within Protostorm's Local Civil Rule 56(B) statement of facts.  (*See* Dkt. 73] at 7-15.)  Citations to trial transcripts ("Tr.") refer to the pagination within the transcript itself, rather than the pagination assigned by the Electronic Case Management System. Citations to all non-transcript exhibits refer to the pagination assigned by the Electronic Case Management System.

priority date among all the countries that the filer designates in the application. (Nixon[2] Tr. at 1840-1842; Brundidge Tr. at 649.)  To actually obtain a patent from a designated country, however, the applicant still must make the appropriate country-specific filings during the "national phase" of the application process.  (Nixon Tr. at 1840-1842; Brundidge Tr. at 649.)  The Firm designated an interest in patent protection in 86 countries on the PCT Application, but failed to check the box for the United States.  (SOF ¶¶ 10, 19; PCT App. [Dkt. 73-14] at 3.)

The Firm's negligent PCT Application jeopardized Protostorm's ability to receive patent protection in the United States.  The initial country designations, however, were preliminary and could have been corrected as a matter of course as late as September 2001.  (Rappaport[3] Tr. at 823; Nixon Tr. at 1852-1853.)  Instead of filing a correction, the Firm abandoned Protostorm's patent application on September 20, 2001, without informing Protostorm.  (*See* SOF ¶ 16; Brundidge Tr. at 698; Nov. 20, 2007 email [Dkt. 73-10] at 3.)  Even after missing the September 2001 deadline, the Firm could have preserved Protostorm's ability to seek a U.S. patent by filing a new application by February 2003, at the absolute latest.

---

[2]  Larry S. Nixon was an expert for the Insured in the Underlying Litigation.  (*See* Nixon Tr. at 1836.)
[3]  Irving Shale Rappaport was an expert witness for Protostorm in the Underlying Litigation.  (*See* Rappaport Tr. at 781-782.)

(Rappaport Tr. at 817, 823.  *But see* Nixon Tr. at 1854
(testifying that the deadline to refile was January 2003).)
Because the Firm had completely ceased working on Protostorm's
application, it missed the last-chance February 2003 U.S.
deadline and also missed the early 2003 national-phase deadlines
to pursue patents in any of the 86 countries actually designated
in the PCT Application.  (*See* Nixon Tr. at 1841, 2057; Brundidge
Tr. at 666, 716; Rappaport Tr. at 890, 905.)

As those deadlines slipped away, Protostorm was
unaware the Firm had abandoned the application.  The Firm had
not withdrawn as counsel of record at the PTO or the World
Intellectual Property Organization.  (SOF ¶ 22.)  Furthermore,
the Firm told Protostorm in December 2001 that the PCT
Application had been submitted and was proceeding accordingly.
(SOF ¶ 11.)

A.      The Firm's Conduct in 2006 and Later

Protostorm and the Firm had no communication for five
years after that December 2001 phone call.  (SOF ¶ 12.)
Protostorm's Peter Faulisi reached out to the Firm in early
2006, leaving unanswered messages in February, April, July, and
November of 2006.  (SOF ¶ 12.)  Finally in June 2007, Faulisi
was able to reach Alan Schiavelli ("Schiavelli"), the managing
partner at the Firm.  (SOF ¶ 13.)  Schiavelli told Faulisi that
the Firm had filed Protostorm's international patent

4

application, but that there were problems with the application. (SOF ¶ 13.)  Faulisi was surprised by this concerning news and hired attorney Jonathan Moskin ("Moskin") to investigate.  (SOF ¶¶ 13-14.)  Through an exchange of several emails and letters, Moskin was finally able to pry an admission from Schiavelli that the Firm had unilaterally abandoned Protostorm's application in September 2001.  (SOF ¶ 16.)  Two letters later, on January 25, 2008, Schiavelli revealed for the first time that the Firm had failed to designate the United States in the application.  (SOF ¶ 20.)  At the time of those communications, the Firm was still listed as Protostorm's counsel of record at the PTO and with the World Intellectual Property Organization.  (SOF ¶ 22.)

B.      The Underlying Malpractice Lawsuit

In March 2008, Protostorm filed a legal malpractice lawsuit in New York against the Firm, Schiavelli, and two attorneys that worked on the patent application but left the Firm in 2004—Frederick D. Bailey ("Bailey") and Carl I. Brundidge ("Brundidge") (collectively "Insured").[4]  (SOF ¶ 23.) Protostorm filed a second amended complaint on August 24, 2009,

---

[4]      Brundidge and Schiavelli were named as defendants in the second amended complaint.  Despite the later addition of those defendants, the New York court and the jury verdict focused on the timing of the original complaint for purposes of the statute of limitations.  (See E.D.N.Y Summ. J. Mem. Op. [Dkt. 73-3] at 24 n.21; Verdict Form [Dkt. 69-7] at 3.)  Parties do not argue that the late addition of those defendants makes any difference in this case and the Court does not find the timing difference relevant.

in which it summarized the Insured's various acts of negligence
to include the following failures:

> (1) to designate the United States on the
> PCT Application; (2) to take appropriate
> steps to correct their errors in failing to
> designate the United States; (3) to the
> extent they deemed it necessary to have a
> power of attorney, to prepare and have
> executed a power of attorney to be filed
> simultaneously with the PCT Application or
> obtain extensions of time thereafter to file
> the power of attorney; (4) to keep
> plaintiffs advised of the status of the PCT
> application; (5) to prosecute the patent
> application in any of the countries
> defendants did designate; (6) ever to
> disclose to plaintiffs that their United
> States patent rights had been needlessly
> abandoned; and (7) to file a new United
> States application, which could have been
> done as late as January 2003, one year after
> the publication of the PCT Application.

(Sec. Am. Compl. [Dkt. 73-2] ¶ 50.)  As relief, Protostorm

sought damages "sufficient to compensate plaintiffs for the

needless abandonment of their patent rights," punitive damages,

and costs and fees.  (*Id.* ¶ 61(a)-(d).)

Before trial, the parties filed cross-motions for

summary judgment.  The Insured argued that New York's three-year

statute of limitations barred Protostorm's legal malpractice

claim.  (*See* Firm Mot. for Summary J. [Dkt. 73-16] at 14.)  The

New York court noted that Protostorm filed the complaint over

six years after the Firm negligently submitted the final PCT

Application in 2001 and that the statute of limitations begins

6

to run on "the day an actionable injury occurs." *See Protostorm, LLC v. Antonelli, Terry, Stout & Kraus, LLP*, 834 F. Supp. 2d 141, 155 (E.D.N.Y. 2011).  The court could not conclusively decide that the claim was untimely, however, because it was disputed whether the Firm continued to represent Protostorm through 2008, thereby tolling the statute of limitations under New York's continuous representation doctrine. *Id.* at 157.  Thus, the Court denied the Firm's motion for summary judgment based on the statute of limitations.

The court also denied Protostorm's cross-motion for summary judgment on the merits of its legal malpractice claim. The court noted that, to the extent the Firm was retained to prosecute the patent between 2002 and 2003, the Firm's "lapses clearly constituted a failure to exercise ordinary skill." *Id.* at 158.  However, there remained a question of fact as to whether the Firm was retained to "substantively prosecute the patent to completion" or to merely "physically file the PCT application and accomplish other ministerial tasks." *Id.* Therefore, the court granted Protostorm summary judgment on the limited question of the Firm's breach of its duty to prosecute the patent by the beginning of 2003, if such a duty existed.

C.        Jury Instructions and Verdict

After the jury heard weeks of testimony regarding the facts discussed above, the court instructed the jury on the

7

elements of a legal malpractice cause of action in New York.
Regarding the duty and breach elements, the court instructed the
jury as follows:

> The court has already considered evidence
> with respect to the manner in which ATS&K
> handled the PCT application, and I have
> ruled that if you find that, first,
> defendants were retained to substantively
> prosecute the patent application and that,
> two, the attorney-client relationship
> persisted after September 2001, you must
> find that defendants failed to exercise the
> degree of skill, care, and diligence
> commonly used by an ordinary member of the
> legal profession in their situation.
>
> Put another way, if you find the defendants
> were retained to do more than physically
> file the PCT application and that the
> attorney-client relationship existed after
> September 2001, then you must find that
> plaintiffs have met their burden of proof
> with respect to the breach element of their
> legal malpractice claim.

(Jury Charge Tr. at 3078.)  Regarding proximate cause, the jury
was instructed that Protostorm "must prove that but for
defendants' negligence they would have obtained at least one
issued, subsisting, valid, and enforceable U.S. patent or a
corresponding foreign patent on the Protostorm inventions."
(Jury Charge Tr. at 3080.)  Regarding damages, the court
instructed that "plaintiffs are seeking compensatory damages
calculated as the reasonable royalties plaintiffs would have
received in licensing the rights to use any patent issued to
Protostorm, had any issued."  (Jury Charge Tr. at 3089.)  The

8

court noted that Protostorm estimated royalties based on the 20-
year life of a patent, "measured from June 25, 2001, . . . the
date of the PCT application."  (Jury Charge Tr. at 3089.)
After instructing the jury as to those elements of the legal
malpractice claim, the court turned to affirmative defenses.
(Jury Charge Tr. at 3092.)

        The court instructed that the statute of limitations
would be tolled under the continuous representation doctrine if
Protostorm proved that "defendants' representation of plaintiffs
continued until at least March 2005" regarding the "specific
subject matter underlying the malpractice claim."  (Jury Charge
Tr. at 3093.)  But if the Firm's representation ended on or
before March 4, 2005, the court instructed that the legal
malpractice claim would be barred.  (Jury Charge Tr. at 3093.)
The jury also heard that the statute of limitations defense
would not apply if the defendants engaged in intentional
wrongdoing or knowingly concealed material facts, despite having
a duty to inform.  (Jury Charge Tr. at 3094.)  If such
wrongdoing or concealment prevented Protostorm from learning of
the malpractice "until at least March 2005," then the jury was
instructed that the statute of limitations did not apply.  (Jury
Charge Tr. at 3094.)

        After receiving the above instructions, among others
not material to this proceeding, the jury submitted its verdict

on a special form.   (Verdict Form [Dkt. 69-7].)   The jury

concluded that the Firm and attorneys Brundidge and Bailey

maintained an attorney-client relationship with Protostorm to

substantively prosecute the patent application, the relationship

continued after September 2001, and that Protostorm suffered

damages due to defendants' negligence.   The jury found that

Protostorm, however, did not have an attorney client

relationship with Schiavelli—the managing partner who

communicated with Faulisi and Moskin in 2006 and 2007.   Within a

section labeled "Statute of Limitations," the jury found that

the Firm, Bailey, and Brundidge continued to represent

Protostorm after March 4, 2005, thereby tolling the statute of

limitations.   Additionally, the jury concluded that the Firm and

Brundidge affirmatively concealed the malpractice, such that

Protostorm did not learn of the malpractice until at least March

2005.   The jury awarded $6,975,000 in compensatory damages.[5]

D.        The Present Insurance Litigation

          In November 2015, the Firm's professional liability

insurer—MLM—filed the present declaratory judgment action to

determine its indemnification obligation regarding the

malpractice judgment.   The Policy at issue covers "all sums up

to the limit of [MLM's] liability, which the INSURED may be

---

[5]    The jury also awarded $1 million in punitive damages.   All
parties agreed at oral argument before this Court that punitive
damages are not covered by the MLM Insurance Policy.

10

legally obligated to pay as DAMAGES due to any CLAIM . . .
resulting from the rendering [of] . . . PROFESSIONAL SERVICES
while engaged in the private practice of law." (Policy [Dkt.
69-1] at 9.)  MLM's liability is limited to $5 million "[w]ith
respect to any CLAIM . . . arising out of any act, error or
omission which occurred on or before: 10/25/06." (Policy at
25.)  MLM's liability is $10 million, however, "[w]ith respect
to any Claim[6] . . . arising out of any act, error or omission
which occurred subsequent to: 10/25/06." (*Id.*)  CLAIM is
defined as a "lawsuit . . . seeking DAMAGES." (*Id.* at 10.)  And
DAMAGES are defined as monetary judgments or settlements
excluding several types of damages that do not compensate for
loss, such as punitive damages or treble damages.

MLM concedes that the Policy covers the legal
malpractice judgment entered against the Insured.  The question
before this Court is whether MLM is liable for $5 million or $10
million.  MLM brought suit seeking a declaration that its
liability is limited to $5 million.  Protostorm, Brundidge,
Bailey, Schiavelli, and the Firm filed counterclaims, seeking a
declaration that MLM is liable to pay $10 million because the

---

[6]   The second reference to "Claim" within the limitation of
liability endorsement is not fully capitalized.  (Policy at 25.)
Throughout the Policy, words appearing in all capital letters
have a special meaning defined in a definitions section of the
Policy.  (*Id.*)  At oral argument before this Court, all parties
agreed that, within the limitation of liability endorsement,
"Claim" has the same meaning as "CLAIM."

underlying judgment arises out of acts, errors, or omissions occurring after October 2006.  Parties filed cross-motions for summary judgment, which have been fully briefed and argued at an oral hearing.  This matter is now ripe for disposition.

## II.   Standard of Review

Summary judgment is appropriate only if the record shows that "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  A genuine issue of material fact exists if the evidence, when viewed "in the light most favorable to the non-moving party," *Miller v. Leathers*, 913 F.2d 1085, 1087 (4th Cir. 1990), "is such that a reasonable jury could return a verdict for the nonmoving party," *Anderson*, 477 U.S. at 248.

On cross-motions for summary judgment, the court must review each motion separately on its own merits.  *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003).  "When considering each individual motion, the court must take care to resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion."  *Id.* (internal quotations and citation omitted).

The interpretation of an insurance policy is a question of law that is particularly well suited for summary

12

judgment.  *See St. Paul Fire & Marine Ins. Co. v. Jacobson*, 826

F. Supp. 155, 157 (E.D. Va. 1993), *aff'd* 48 F.3d 778 (4th Cir.

1995); *The Doctors Co. v. Women's Healthcare Assocs., Inc.*, 749

S.E.2d 523, 528 (Va. 2013).  Virginia's principles of contract

interpretation govern[7] in this diversity[8] action.  "[C]ourts

interpret insurance policies, like other contracts, in

accordance with the intention of the parties gleaned from the

words they have used in the document."  *Seals v. Erie Ins.

Exch.*, 674 S.E.2d 860, 862 (Va. 2009).  When considering the

meaning of any phrase or clause within the policy, the court

should "construe the contract as a whole."  *The Doctors Co.*, 740

---

[7]    All parties agreed at oral argument that Virginia law
governs the interpretation of this Policy.  *Cf. Minn. Lawyers
Mutual Ins. Co. v. Antonelli, Terry, Stout & Kraus, LLP*, No.
1:08-cv-1020, 2010 WL 4853300, at *7 (E.D. Va. Nov. 18, 2010),
*aff'd* 472 F. App'x 219 (4th Cir. 2012) (applying Virginia law to
same Policy); *see also Minn. Lawyers Mutual Ins. Co. v.
Antonelli, Terry, Stout & Kraus, LLP*, 355 F. App'x 698, 701 (4th
Cir. 2009) (same).
[8]    The requirements of 28 U.S.C. § 1332(a) are met here.
Plaintiff MLM is incorporated under the laws of Minnesota with
its principle place of business in Minnesota.  (Compl. [Dkt. 1]
¶ 3.)  The individual defendants Bailey, Brundidge, and
Schiavelli are citizens of North Carolina, Virginia, and
Virginia, respectively.  (Compl. ¶¶ 6-8.)  The Complaint does
not reveal the citizenship of the members of Protostorm, LLC or
Antonelli, Terry, Stout & Kraus, LLP.  Nonetheless, at oral
argument before this Court, Defendants proffered that no member
of those organizations is a citizen of Minnesota.  *Cf. Central
W. Va. Energy Co., Inc. v. Mountain State Carbon, LLC*, 636 F.3d
101, 103 (4th Cir. 2011) (noting citizenship of a limited
liability company "is determined by the citizenship of all its
members").  Accordingly, complete diversity of citizenship
exists.  Furthermore, this case far exceeds the required amount
in controversy.

S.E.2d at 526.   If the terms of the policy are plain and clear, the court must adhere to those terms and give them their plain meaning.   *See Blue Cross & Blue Shield v. Keller*, 450 S.E.2d 136, 140 (Va. 1994).

If the policy language is ambiguous, rather than clear, the court must construe the policy against the drafter—the insurer.   *Resource Bankshares Corp. v. St. Paul Mercury Ins. Co.*, 407 F.3d 631, 636 (4th Cir. 2005).   The "mere fact that the parties dispute the meaning of the language does not itself render the contract ambiguous," *Trex Co. v. ExxonMobil Oil Corp.*, 234 F. Supp. 2d 572, 575 (E.D. Va. 2002), and "courts must not strain to find ambiguities," *Resource Bankshares*, 407 F.3d at 636.   Rather, an ambiguity exists when a policy provision "can reasonably have more than one meaning given its context, or [w]here two constructions are equally possible, or reasonable [persons] . . . may reach reasonable, but opposite, conclusions based on a policy's language."   *SunTrust Mortg., Inc. v. AIG United Guar. Corp.*, 784 F. Supp. 2d 585, 592 (E.D. Va. 2011) (internal quotations and citations omitted).

This case involves the duty to indemnify, which "refers to an insurer's responsibility to pay a monetary award when its insured has become liable for the covered claim." *Nationwide Mut. Ins. Co. v. Overlook, LLC*, 785 F. Supp. 2d 502, 513 (E.D. Va. 2011).   Unlike the duty to defend, which "is based

14

on the allegations in the underlying complaint, the duty to indemnify relies on litigated facts." *CACI Int'l, Inc. v. St. Paul Fire & Marine Ins. Co.*, 566 F.3d 150, 155 (4th Cir. 2009). Thus, the court must look to the underlying proceedings, the trial transcript, and the jury verdict to determine the facts actually discovered or proven. *CACI*, 566 F.3d at 155; *Builders, Design & Dev. LLC*, 785 F. Supp. 2d. 535, 542 (E.D. Va. 2011); *Capital Envtl. Servs., Inc. v. N. River Ins. Co.*, 536 F. Supp. 2d. 633, 645 (E.D. Va. 2008). The material facts from the underlying lawsuit are not disputed, but the application of those facts to the MLM Policy is contested. That issue is a question of law that is appropriately resolved in these summary judgment proceedings.

### III.   Analysis

The primary question of interpretation before this Court is whether the malpractice judgment against the Insured is a CLAIM "arising out of any act, error, or omission which occurred subsequent" to October 25, 2006.[9] If it is, MLM is liable to indemnify the Insured up to $10 million. If it is not, then MLM is only liable to indemnify the Insured up to $5 million. To resolve that question, the Court must determine

---

[9]   References to "October 2006" within this Memorandum Opinion should be read as synonymous with "October 25, 2006."

what "CLAIM" and "arising out of" mean in the context of this Policy.

The Policy defines "CLAIM" to mean a "lawsuit served upon the INSURED seeking DAMAGES."[10]  And DAMAGES are defined as monetary judgments or settlements, excluding some types of noncompensatory judgments, such as punitive or treble damages. Of course, the Court must also consider the context in which "CLAIM" appears.  The reference to "CLAIM" at issue here appears within an endorsement discussing MLM's obligation to indemnify an insured.  And the Policy only covers claims that result from "the rendering or failing to render PROFESSIONAL SERVICES." Thus, it is only reasonable to interpret "CLAIM" in the context of the limitation of liability endorsement to have a more specific meaning than a general lawsuit for compensatory damages.  To interpret "CLAIM" that broadly would sweep in all theories of recovery alleged within a lawsuit, even if some of those theories were clearly outside of the Policy's coverage and would have no effect on MLM's indemnification liability. Therefore, read in the context of the limitation of liability endorsement, "CLAIM" means the cause of action within a lawsuit that obligates MLM to pay damages covered by the Policy.

---

[10]   The Policy provides two alternate definitions for the term CLAIM, but neither party argues that those definitions are applicable to the present dispute.

The Policy does not expressly define the phrase "arising out of."  Fortunately, the Virginia Supreme Court recently provided guidance on the plain and unambiguous meaning of that phrase in the context of a professional liability insurance policy.  In *The Doctors Co. v. Women's Healthcare Associates, Inc.*, the Virginia Supreme Court concluded that "arising out of" has a broad meaning, even broader than the phrase "resulting from."  740 S.E.2d 523, 527 (Va. 2013).  The Virginia Supreme Court applied the phrases "arising out of" and "arising from" to require a causal connection between a particular fact or source of law and an essential element of the cause of action alleged.  In other words, the court considered whether the identified fact was "required" or "necessary to the elements of the cause of action."  *Id* at 528.  The insurer's liability arose out of those "required" or "necessary" facts, but did not arise out of facts that were merely "incidental" to the necessary elements of the plaintiff's cause of action.[11]  *Id.*

---

[11]   Parties on both sides of this case identify that federal district courts applying Virginia law have interpreted "arising out of" to mean "originating from," "having its origin in," "growing out of," "flowing from," or "incident to or having connection with."  (*See* MLM Mem. in Supp. at 13; Protostorm Opp'n at 21-22 (quoting *Trex Co. v. ExxonMobil Oil Corp.*, 234 F. Supp. 2d 572, 576 (E.D. Va. 2002); *St. Paul Fire & Marine Ins. Co. v. Ins. Co. of N. Am.*, 501 F. Supp. 136, 138-39 (W.D. Va. 1980)).  Defendants, in particular, seek to define "arising out of" as synonymous with "incident to."  That definition, however, conflicts with the Virginia Supreme Court's statement that liability does not arise out of something "incidental" to the

at 527-28.  Applying the above definitions to the undisputed facts in this case, it is only reasonable to conclude that the malpractice judgment did not arise out of any act, error, or omission that occurred after October 25, 2006.

The Court must proceed by identifying the elements of the malpractice claim creating MLM's obligation to indemnify and then determine whether any post-October 2006 act, error, or omission was necessary or required to the jury finding that the elements of that cause of action were satisfied.  The New York court instructed the jury that a New York legal malpractice action requires an attorney-client relationship to exist when the attorney breached his duty to the client, thereby proximately causing the plaintiff to sustain an economic loss. (Jury Charge at 3075.)  As the New York court's jury instructions and the verdict form clearly demonstrate, the Insured's breach of duty was their failure to prosecute the

---

cause of action.  *See The Doctors Co.*, 740 S.E.2d at 527.  The district court cases Defendants rely upon predate *The Doctors Co.* and derive their definitions of "arising out of," in part, from Missouri and Utah law.  *See St. Paul Fire & Marine*, 501 F. Supp. at 138-139 (quoting *Red Ball Motor Freight v. Emp'rs Mutual Liab. Ins. Co.*, 189 F.2d 374, 378 (5th Cir. 1951) (Missouri Law); *Blue Bird Body Co. v. Ryder Truck Rentals*, 583 F.2d 717, 726 (5th Cir. 1978) (relying upon *Red Ball*); *Nat'l Farmers Union Prop. & Cas. Co. v. W. Cas. & Surety Co.*, 577 P.2d 961, 963 (Utah 1978) (Utah law)).  Consequently, those district court cases inform this Court's interpretation of "arising out of" as having an unambiguously broad meaning.  But where those cases conflict with the Virginia Supreme Court's more recent interpretation, this Court finds the Virginia Supreme Court's interpretation more persuasive.

patent applications.  That failure was irremediable by early 2003, at the latest.  The only theory of economic loss flowing proximately from that breach was that Protostorm lost potential royalty payments, which were calculated through the twenty-year life of a patent beginning in 2001 and extending through 2021. (*See* Rappaport Tr. at 1004; Jury Charge Tr. at 3089.) Accordingly, based on the evidence presented to the jury and the jury's verdict, all of the elements necessary for the accrual of the malpractice cause of action were present by early 2003, at the latest.  *See Protostrom*, 834 F. Supp. 2d at 155 (noting malpractice cause of action accrues on the "day an actionable injury occurs" (quoting *McCoy v. Feinman*, 785 N.E.2d 714, 718 (N.Y. 2002)).  Nothing that occurred later to toll the statute of limitations could act to "delay the point at which the cause of action accrues."  *In re Osborne*, No. 13-cv-28-3, 2013 WL 11317662, at *2 (S.D.N.Y. Oct. 9, 2013) (quoting *Glamm v. Allen*, 439 N.E.2d 390, 393 (N.Y. 1982)).  Consequently, the malpractice action could not have been a CLAIM arising out of any act, error, or omission occurring after October 2006.

Defendants' arguments to the contrary are not persuasive.[12]  Defendants' most compelling argument is that the

---

[12]     The Policy is ambiguous as to which liability limitation applies to a CLAIM that arises out of acts occurring both before and after October 25, 2006.  MLM could have written a policy to exclude the higher coverage for CLAIMS falling into both

CLAIM at issue is the entire malpractice lawsuit, and that the success of that lawsuit depended on some post-October 2006 act to toll the statute of limitations.  Thus, according to Defendants, the causal connection between the success of the overall lawsuit and the continuation of the attorney-client relationship into 2008 means that the CLAIM is one arising out of some post-October 2006 act.  That argument, however, is not factually or legally supported.

As a factual matter, no post-October 2006 act, error, or omission was necessary to the tolling of the statute of limitations.  The statute of limitations only needed to be tolled until March 4, 2005, and that is what the jury found.  Thus, it was completely tangential to the success of the lawsuit that the continuation of the attorney-client relationship or an act of concealment could have tolled the statute of limitations even longer.

---

periods, but it did not do so.  For examples of such policies, see *ABCO Premium Fin. LLC v. Am. Int'l Grp.*, No. 11-23020, 2012 WL 3278628 (S.D. Fla. Aug. 9, 2012); *Summit Med. Sys., Inc.*, 610 N.W. 2d 350, 353 (Minn. Ct. App. 2000).  Because of this ambiguity, the Court must interpret the Policy to permit the larger liability coverage for a CLAIM that arises out of acts occurring in both time periods. *See Mutual Fire, Marine & Inland Ins. Co. v. Vollmer*, 508 A.2d 130, 134 (Md. 1986) (construing policy in favor of insured because policy was "silent on its application where malpractice is alleged to have been committed both before and after the retroactive date").  As described in the following paragraphs, however, the CLAIM in this case does not span both time periods.  The CLAIM at issue only arises out of acts, errors, or omissions occurring on or before October 25, 2006.

As a legal matter, it is clear under the New York law that governed the malpractice lawsuit that acts tolling the statute of limitations do not affect the date of accrual of the cause of action itself.  As the New York Court of Appeals noted in *Glamm v. Allen*, "[a]n action for malpractice accrues at the date of the malpractice complained of.  This is so even if one or several subsequent events have the effect of tolling the Statute of Limitations period."  439 N.E.2d 390, 393 (N.Y. 1982).  When combining that principle with the Virginia Supreme Court's instructions to look at the "elements of the cause of action," 740 S.E.2d at 528, it is unavoidable that acts tolling the statute of limitations do not extend the time out of which the claim arises.

Several cases interpreting claims-made insurance policies have reached the same conclusion when faced with the argument that the continuation of an attorney-client relationship carries the malpractice claim into the temporal scope of the policy's coverage.  For example, the liability insurance policy in *Colip v. Claire* only covered claims based on conduct occurring after 1984.  26 F.3d 713, 716 (7th Cir. 1994).  The attorney in that case was sued for negligently preparing a limited partnership agreement for an oil drilling venture in 1983, but the attorney continued to represent the client into 1985 and even visited the oil wells in that year.  *Id.* at 716.

21

The court called it a "smokescreen" to argue that those post-
1984 acts brought the claim within the policy coverage because
"the malpractice suit against [the attorney] was based upon his
preparation of the private placement memoranda . . . prior to
the inception date." *Id.* A New York federal court reached the
same conclusion in *Coregis Insurance Co. v. Blancato*, 75 F.
Supp. 2d 319 (S.D.N.Y. 1999). In that case, the attorney made
the same continuation-of-the-relationship argument in an attempt
to bring his malpractice within the time-period of coverage.
The court criticized the attorney for presenting "no legal
authority, let alone basis in logic, for the argument that an
insurer may be forced to defend an insured for acts of legal
malpractice occurring outside the terms of its policy simply by
virtue of the fact that the attorney continues to act on the
client's behalf after the policy becomes effective." *Id.* at
322. Similarly, in *Ferguson v. General Star Indemnity Co.*, a
lawyer negligently filed tax returns in 1994, but his insurance
policy only covered claims "arising out of" events after 1997.
582 F. Supp. 2d. 91 (D. Mass. 2008). The court rejected the
argument that the policy applied due to the attorney's post-1997
conduct, which included failing to remedy the filing, failing to
mitigate damages, failing to update the client, and becoming an
"obstacle" to the client paying the taxes. *Id.* at 100. The
court stated that the client's injuries "originated from, grew

22

out of, flowed from, were incident to, or had connection with" the 1994 filing and the more recent acts "do not negate" that fact. *Id.* Defendants do not present any rebuttal authority to those cases, which further supports this Court's interpretation that the CLAIM in this case did not arise out of any act occurring after the Insured negligently failed to prosecute the patent applications in early 2003 thereby proximately and irremediably causing Protostorm to lose the potential to earn any patent royalties.

As a second argument, Defendants contend that the Firm committed legal malpractice after October 2006 by failing to keep Protostorm informed of the patent application. That theory of malpractice, however, was never presented to the jury and was not a basis for the damages that MLM is being asked to indemnify. The jury was not instructed that a claim of malpractice could be based on a failure to inform and the special verdict form did not allow for such a finding. The jury did not conclude that there was a breach of any duty for a failure to inform after October 2006. Furthermore, there was no evidence of damages resulting from a failure to inform after October 2006. In short, it would mischaracterize the underlying litigation to conclude that the jury found any element of the malpractice claim based on a failure to inform Protostorm of anything after October 2006.

In summary, the Court concludes as a matter of law that the malpractice judgment underlying these declaratory judgment actions is a CLAIM arising out of acts, errors, or omissions which occurred only before October 25, 2006, and not after October 25, 2006.  Accordingly, MLM's liability to indemnify for that judgment is limited to $5 million.

### IV.   Conclusion

For the foregoing reasons, the Court will grant summary judgment in favor of Plaintiff/Counter-defendant Minnesota Lawyers Mutual Insurance Company.  The Court will deny summary judgment for Defendants/Counterclaimants Protostorm, LLC; Antonelli, Terry, Stout & Kraus, LLP; Alan Schiavelli; and Carl Brundidge.

An appropriate order will issue.

/s/

James C. Cacheris

June 22, 2016
Alexandria, Virginia                UNITED STATES DISTRICT COURT JUDGE